## Commonwealth *v.* Trignani, Appellant.

334

Argued October 9, 1957. Before Rhodes, P. J., Hirt, Gunther, Wright, Woodside, Ervin, and Watkins, JJ.

*Michael von Moschzisker,* with him *Sidney Ginsberg,* for appellant.

*Juanita Kidd Stout,* Assistant District Attorney, *James N. Lafferty,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

Opinion by Woodside, J., January 21, 1958:

The defendant, Anthony J. Trignani, was found guilty by a jury of aggravated robbery, and of assault and battery with intent to commit murder. After receiving a sentence of 10 to 20 years in the penitentiary, he appealed to this Court, claiming that he should be granted a new trial.

Philip J. Anzelone, an employee of the C. & C. Clothing Co., 1234 Carpenter St., Philadelphia, was returning from the bank at about 12:30 o'clock in the afternoon of November 25, 1955, carrying a brief case containing the company's payroll of approximately $10,300. As he walked across a platform in the rear of the company's building, a man opened a restaurant

door about 10 feet away from him, jumped onto the platform and approached him. The man then grabbed the brief case and said, "Give me the bag". As there were several people in the immediate vicinity, Anzelone thought it was a joke and said, "Let go, it is the payroll". Thereupon, the man shot Anzelone in the stomach, took the brief case with the money, and ran away. Anzelone, not knowing that he had been shot, chased the robber across the platform and down the street and then fell to the sidewalk. In the meantime the robber entered a Ford car and disappeared. The car in which the robber is believed to have left the scene was abandoned a short distance away. It apparently had been stolen the morning of the robbery.

A number of people saw the robbery and identified the defendant as the man who committed it.

Seven or eight days after the shooting the defendant was brought before the victim in the Community Hospital and was identified with certainty by him. At the trial, Anzelone said that he looked the robber in the face when the man approached and shot him and on two instances while chasing him. He said that he was positively certain that the defendant was the man who shot him, and that "the position I was in I could never forget that face."

The defendant was also identified as the robber by other eyewitnesses to the crime, including Carl Lindsay, Josephine Scafidi, Estella Stephenson and an eleven year old boy, Clarence Perkins. Lindsay positively identified the defendant at the trial and at a police line-up as the man who had committed the robbery. Scafidi and Stephenson also picked the defendant out of a line-up and identified him at the trial, although Mrs. Scafidi qualified her testimony with "I think it was him." Shortly after the robbery Mrs. Stephenson was shown photographs at the police sta-

tion, and said that one of them, which was not of the defendant, "looks a little like the man". When the person, whose picture she had seen, was picked up and brought before her she said definitely that he was not the man who committed the robbery. Subsequently at the police line-up and at the trial she identified the defendant as the robber. Although Clarence, the 11 year old boy, identified the defendant at the trial he had previously identified another person as the robber. His testimony concerning identity was for the jury, but in our opinion was worthy of very little weight.

On December 2, the defendant, having learned that the police were looking for him, appeared with his counsel, Sidney Ginsberg, and surrendered himself to them. When questioned by the police he said that he knew nothing about the robbery, that he was in no way connected with it, and that at the time it was committed he was in a room with several other men at 763 South 8th Street preparing it for occupancy as a club, which he and the others were forming. According to the policemen who were witnesses, the defendant did not tell who these men were except to identify one of them as "Joe", and according to one of the officers, another as "Domenick". He told the officers that they could learn from his counsel who these men were.

At the trial, Santo Romeo, Joseph Mellace, Carmen DiTore and Salvatore Matteo, testified that the defendant was with them at the club room during the time of the robbery.

The Commonwealth's case rests upon the identification of the defendant by the eyewitnesses of the crime. There was little or no corroborating circumstantial evidence. The money, the brief case and the gun involved in the robbery were not found, and the

defendant was not connected to the car by which the robber made his escape from the scene of the crime.

Concerning identification testimony, the trial judge charged, inter alia, as follows: "Any law that has been given to you by either the District Attorney or by Mr. McBride with respect to what the Supreme Court has announced on the question of identification should not be regarded by you as the law of our Supreme Court. The law of our Supreme Court, as announced by our Supreme Court as late as 1954, is:

" 'Where the opportunity for positive identification is good and the witness is positive in his identification and his identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with especial caution. Indeed the cases say that positive testimony as to identity may be treated as a statement of a fact. For example, a positive, unqualified identification of a defendant by one witness may be sufficient for conviction even though half a dozen witnesses testify to an alibi.

" 'On the other hand, where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more prior occasions, the accuracy of the identification is so doubtful that the testimony as to identity must be received with caution.' "

The appellant contends that this was error because his counsel had argued to the jury substantially in the language of *Bryant's Estate,* 176 Pa. 309, 318, 35 A. 571 (1896), that "There are few more difficult subjects with which the administration of justice has to deal [than identity]. The carelessness or superficiality

of observers, the rarity of powers of graphic description, and the different force with which peculiarities of form or color or expression strike different persons, make recognition or identification one of the least reliable of facts testified to even by actual witnesses who have seen the parties in question; and where they have not, there is the added obstacle of the inadequacy of language to describe the minute variations of feature and color which go to make up the individual personality."

Appellant contends that this is the law and the trial judge should not have told the jury to ignore what counsel stated the law to be. We might note in passing that the jury must take the law from the court not from the counsel.

In *Commonwealth v. Kloiber,* 378 Pa. 412, 423, 424, 106 A. 2d 820 (1954) the Supreme Court criticized the language used in *Commonwealth v. House,* 223 Pa. 487, 72 A. 804 (1909) concerning the unreliability of identification evidence and, although not specifically, at least by implication, also criticized the statements contained in *Bryant's Estate,* supra. *Bryant's Estate* was quoted as authority in *Commonwealth v. House,* for what was criticized in *Commonwealth v. Kloiber.*

In addition to quoting from *Commonwealth v. Kloiber,* supra, the trial judge charged: "... identification testimony must be studied by a jury very carefully. You must remember also that the identification of the defendant by the Commonwealth's witnesses was made by individuals who had never seen the defendant before and who claimed they saw the defendant during a very brief period of time, varying from seconds to a minute or so . . . We all know in our own experience that we have at times mistaken a passer-by on the streets, and thought we had seen an acquaintance, only to find there was a resemblance, but that we were mis-

taken in thinking the passerby was an acquaintance." At another place in the charge concerning identification testimony the trial judge stated: "Be very careful in going over that testimony."

We think the charge concerning identification testimony was emminently fair to the defendant.

The defendant also objected to certain testimony given by the police in rebuttal. The defendant had testified that when he was first taken into custody, he told the police that he had been at the Club Continental with four other men and gave the officers their first names. In rebuttal the Commonwealth called four police officers who had talked to the defendant, three of whom testified that the defendant had given them only one name, that of "Joe", and one of whom testified that the defendant had given two names, "Joe and Domenick".

Although these officers had apparently done most of the questioning of the defendant while he was in custody, they were not the only policemen who questioned him. The defendant argues that because the Commonwealth could not establish the identity of all the policemen who questioned him, and, therefore, could not produce contradictions from all of them, the evidence of those who did testify was not admissible to contradict the defendant's testimony concerning his statements to "the police". This is a matter which the defendant could, and undoubtedly did, argue to the jury. It represented a weakness in the rebuttal evidence, but it does not make the evidence inadmissible.

The appellant objects to the following part of the trial judge's charge: "Captain Ferguson . . . said he interrogated the defendant and the defendant gave him the names of Joe and Domenick and no other names. There was no witness by the name of Domenick who was called as a witness to support the alibi, so who

that Domenick is we don't know. I will leave that entirely to you to determine what effect that would have upon the defendant's story. Do you believe he told Detective Ferguson the name of Domenick? If he did, you ask yourselves a question as to who this Domenick is. Why wasn't Domenick brought here to offer what he knows, if anything, about this alibi that has been offered by the defendant?"

The defendant argues that the reference to Domenick was prejudicial error because there was no evidence that he was under the defendant's control, and that, therefore, there could be no inference that Domenick's testimony would have been unfavorable to the defendant if he had been called.

The inferences to be drawn from the above testimony referred to in the charge were left to the jury, specifically in the above quoted paragraph and generally by numerous statements elsewhere in the charge.

"Where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation he fails to do so, the jury may draw an inference that it would be unfavorable to him." *Wills v. Hardcastle,* 19 Pa. Superior Ct. 525, 529 (1902); *Green v. Brooks,* 215 Pa. 492, 496, 64 A. 672 (1906); *Haas v. Kasnot,* 371 Pa. 580, 584, 585, 92 A. 2d 171 (1952). The person not produced must be within the power of the party to produce. II Wigmore on Evidence, §286.

Assuming, as it is argued by the appellant, that there is nothing in this case to indicate that it was within his power to produce this witness, neither is there anything here to indicate that it was not within his power to produce this witness, and certainly no person other than the defendant could establish whether or not this witness could be produced.

The reasons why certain evidence which might naturally be looked for, may not be produced, are so many and so various, that the inference to be drawn from the failure to produce it requires careful handling. But, it is a legitimate instrument in the investigation of truth, and a liberal discretion in its use must be allowed to the trial judge. *Steel v. Snyder,* 295 Pa. 120, 127, 144 A. 912 (1929).

We think that when one charged with a crime tells the police at the time of his arrest that he can establish an alibi through a specific person and then neither produces that person nor explains his absence at the trial, the jury may infer that the specified person would not testify favorably to the defendant. This, of course, is an inference of fact, and not a presumption of law. *Steel v. Snyder,* supra, page 128.

We see no error in the court's charge regarding "Domenick."

The appellant argues that the court erred in refusing to admit into evidence as consonant statements the prior declarations of his alibi witnesses.

The crime occurred November 25, 1955. The defendant surrendered himself to the police December 2. On December 7 the alibi witnesses went to the office of the defendant's attorney where they prepared and swore to written statements containing substantially the same information which they subsequently gave at the trial. These written statements were offered by the defendant as consonant statements to establish that the alibi testimony was not a recent fabrication. The court rejected them.

A consonant statement is defined as "a prior declaration of a witness whose testimony has been attacked and whose credibility stands impeached, which, considering the impeachment, the court will allow to be proved by the person to whom the declaration was

made, in order to support the credibility of the witness, and which, but for the existence of such impeachment, would ordinarily be excluded as hearsay," *Lyke v. Lehigh Valley R. R. Co.*, 236 Pa. 38, 48, 50, 84 A. 595 (1912) ; *Commonwealth v. White*, 340 Pa. 139, 143, 16 A. 2d 407 (1940).

Consonant declarations may be given in contradiction of evidence tending to show that the testimony at the bar is a fabrication of a recent date, and to show that the same statement was made before its ultimate effect on the question at issue could have been foreseen. *Risbon v. Cottom*, 387 Pa. 155, 163, 127 A. 2d 101 (1956) ; *Craig v. Craig*, 5 Rawle 91, 97, 98 (1835).

Here the declarations were made to the defendant's lawyer for the sole purpose, and with full knowledge, of its ultimate effect upon the question to be tried. When these men made the statements, they knew of the defendant's arrest for the crime from which their statements were intended to help extricate him. If there was a fabrication there is no reason why it would not have been planned between November 25 and December 7. See *Clever v. Hilberry*, 116 Pa. 431, 9 A. 647 (1887).

Furthermore, the admission of consonant statements is a matter to be decided in every case by the trial judge in the exercise of his discretion and depends, among other things, upon the character and degree of impeachment indulged in by the other side. *Commonwealth v. White*, supra, 340 Pa. 139, 143, 16 A. 2d 407 (1940) ; *Lyke v. Lehigh Valley R. R. Co.*, supra, 236 Pa. 38, 48, 50, 84 A. 595, 598 (1912).

The statements were properly rejected.

We have carefully reviewed the record composed of over 500 pages and are convinced that the defendant received a fair trial, free of prejudicial error. The defendant was represented at the trial by one of this

State's most able trial lawyers, Thomas D. McBride, the present Attorney General of this Commonwealth.

We have carefully examined the charge of the trial judge. Taking it as a whole, and particularly with the numerous additions and corrections made at the request of defense counsel, it was eminently fair, free from bias and without any prejudicial error.

Judgment of sentence affirmed, and it is ordered that appellant appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with his sentence or any part thereof which had not been performed at the time the order of supersedeas was entered.